**Rebecca Sue IODICE, Plaintiff,**

v.

**SOUTHEASTERN PACKING & GASKETS, INC., a Georgia corporation d/b/a Sepco Sales Corp., Defendant.**

Civ. A. No. C81–298A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 3, 1983.

Mary Ann Oakley, Alice Bonner, Atlanta, Ga., for plaintiff.

John P. MacNaughton, Atlanta, Ga., for defendant.

## MEMORANDUM OPINION

HORACE T. WARD, District Judge.

This action was brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., wherein the plaintiff, Rebecca Sue Iodice, alleged that defendant Southeastern Packing & Gaskets, Inc., a Georgia corporation d/b/a Sepco Sales Corp. (hereinafter "Sepco") discriminated against her in that she was terminated because of her pregnant condition. The case was tried by the judge, sitting without a jury, and after the evidence was presented the court took the matter under advisement pending receipt of written briefs, which were subsequently filed. The following memorandum opinion contains the findings of fact and conclusions of law.

## FINDINGS OF FACT

The plaintiff was hired by defendant Sepco in September, 1978 as financial manager, and remained with defendant corporation until May 3, 1980, when she was terminated. Plaintiff, a female, was trained in accounting, having received a B.B.A. degree in accounting from the University of Georgia in August 1973. Prior to coming to defendant corporation she held accounting positions with Esquire Formal Wear and Moxie Industries, Inc., both of Atlanta. She applied with Sepco by answering an ad in the newspaper and sending in a resume. She was subsequently interviewed by various company officials and hired as financial manager.

The defendant Sepco is a Georgia corporation which was started in 1974 with four employees and a gross business of $250,000. By 1980 the corporation had grown to a total of approximately 50 employees with gross sales of about four million dollars. The principal officers of the corporation at all times relevant to this case were James Warren Suggs, Jr., President and principal owner, and David Welch Suggs, Vice President and immediate supervisor of the plaintiff.

Prior to the hiring of the plaintiff, the corporation did not have a financial manager. The principal in-house accountant was Helen Vencill, a full time bookkeeper. Her performance was apparently highly satisfactory to the corporation, but in September 1978 she resigned from the company. The corporation grew rapidly between 1976 and 1978, leading top management to the realization that a more complete financial manager was needed. The position of financial manager was created, to which the plaintiff was the first appointment. The duties of the financial manager included supervision of financial and accounting operations, and later the computer operation. Further duties of the office involved supervising the cash flow of the corporation, receipts and disbursements, and preparation of various financial and accounting reports. The financial manager reported directly to David Suggs. Shortly after plaintiff was appointed to the job she was allowed to hire an accounting clerk by the name of Manju Banthiya, who worked in the plaintiff's office.

The evidence also established that on or about October 1979 the plaintiff received a $3,000 annual increase in her salary as fi-

nancial manager, raising the annual salary from $19,500 to $22,500.

The plaintiff was married in the summer of 1978 and subsequently became pregnant. The top management of defendant corporation was informed of plaintiff's pregnant condition in January 1980. It appears that plaintiff told the president James Suggs and he relayed the information to David Suggs. A week later the plaintiff discussed the matter with David Suggs, her immediate supervisor.

It appears that during the discussion with David Suggs, plaintiff stated that she would like to take a 90-day maternity leave and that she wanted to work up to the time of the delivery of the baby. The doctor had informed the plaintiff that the baby was due August 9, 1980, but in fact it was born July 31, 1980. The matter of the leave of absence and whether the plaintiff would be returning to work thereafter was discussed on several occasions with David Suggs prior to the termination. It appears that David Suggs suggested that she should stay home with the baby. During the latter part of April, 1978, about a week before the termination, plaintiff had a conference with Mr. James Suggs wherein she asked him whether or not the corporation was going to hold her job open while she took a 90-day maternity leave. He told her that they would, but further stated that with only one person in the accounting department they

would need some help during the time that she was away.

On Saturday, May 3, 1978, David Suggs called the plaintiff at home and told her that he thought the best thing for her and the corporation was that there be a parting of the ways, in effect terminating her services as financial manager. During the course of the conversation the plaintiff asked David Suggs whether he would be willing to sign a letter of recommendation for her to provide to other prospective employers and he stated that he would. She also questioned him about whether she would be covered for medical expenses relating to the delivery of the baby, and he stated that she would be covered as the corporation was a self-insurer in this regard. A few days later (May 6 or 7, 1980), the plaintiff returned to Sepco and approached Mr. David Suggs requesting that he sign two letters.[1] The first letter, dated May 7, 1980, from David Suggs to the plaintiff, was the letter of recommendation. In addition to verifying the telephone conversation of May 3, 1980, the letter stated, "As explained, you were terminated because I felt that you were physically unable to perform your duties because of your pregnancy condition." The second letter, which was dated May 6, 1980, confirmed that the plaintiff was entitled to certain medical benefits in connection with her pregnancy and that the corporation would be responsible for the payment of stipulated amounts as set forth in the letter. Upon securing

---

1.                    May 6, 1980
TO WHOM IT MAY CONCERN:
This letter is to verify that Sepco Sales Corporation, located at the above address, is self insured for maternity benefits.
Benefits payable as follows:
a.) Sepco Sales Corporation to be responsible for 100% of the first $1000.00 of hospitalization charges, plus 80% of any excess over $1000.00.
b.) 80% of the first $3000.00 of any other maternity or related medical charges, in each calendar year, plus 100% of any excess over $3000.00. Any benefit payable at 80% under hospitalization charges will be included in the $3000.00 amount.
This is to confirm that Rebecca Sue Iodice is entitled to the above stated benefits for her pregnancy.

                    May 7, 1980
Dear Sue,
Please accept this letter as verification of our termination of your employment with Sepco Sales Corporation as per our telephone conversation of Saturday, May 3, 1980.
As explained, you were terminated because I felt that you were physically unable to perform your duties because of your pregnancy condition.
Sue, I would like for you to feel free to either use this letter or to have a potential employer contact myself for recommendations, since your termination with Sepco Sales Corporation in no way reflects on your capabilities to perform your duties as our financial manager.
We at Sepco wish you the best in the future.

David Suggs' signature on both letters, the plaintiff visited with Manju Banthiya and departed the corporation.

There is considerable conflict in the testimony relating to the contents of the letter of recommendation, dated May 7, 1980, as between the plaintiff and David Suggs. It is clearly established that both letters were prepared and typed by the plaintiff on corporation stationery that she had in her possession. The plaintiff admitted that the words and thoughts in the letter of recommendation were hers, but the contents were based on the conversation she had with David Suggs on May 3, 1980, when she received notice of termination. She further testified that she gave the letter to Mr. Suggs stating that it was the letter of recommendation which she had requested, and that he signed it. He signed the letter covering maternity benefits at the same time. Mr. Suggs testified that he did not read the letter of recommendation in detail, but did fully read the letter concerning maternity benefits as he knew that the benefits would constitute a financial obligation to the corporation. He further stated that since he did not know that the plaintiff was coming that day he was somewhat embarrassed and signed the letters to get her off the premises. He stated that he thought that by signing the letters he was doing her a favor. As to the letter of recommendation, David Suggs testified that it did not contain his language, and that he had not told the plaintiff during the Saturday conversation that she was being terminated because of her pregnant condition.

After David Suggs signed the letters, the plaintiff visited Ms. Banthiya and expressed her surprise that David Suggs had signed the letter, indicating that it was a foolish act.[2] It further appears that a short time before coming to David Suggs' office with the letters the plaintiff visited the State Unemployment Office to file a claim, indicating that she was fired because of her pregnancy.

The interoffice memorandum sent out by David Suggs on May 5, 1980 is perplexing due to the language contained therein. It stated, "We regret to announce the departure of Sue Iodice effective May 3, 1980. Sue and I decided that her condition made it impossible to continue with her heavily demanding job."[3] Regarding the separation notice, David Suggs testified that he was trying to accomplish two things. First, he stated that he was obligated to notify the rest of the employees that the plaintiff was no longer with the company; and second, he wanted to do it in a reassuring kind of way so as not to shake up the work force and at the same time to do the least amount of harm to the plaintiff's career. He testified that "I wanted to let them know she was gone in a way that would give Sue the maximum and the least hurt of feelings that I possibly could." He stated that he did not want to say that plaintiff was fired because she could not do her job. He further stated that he got the word "condition" from a conversation he had with the plaintiff during which she asked whether anyone at the company had noticed

---

**2.** Q. And did you have a conversation with Mrs. Iodice that day?
A. Yes, I did, because she never came around to the office that day and I asked her why you didn't come around, and she said she had gone—she had wanted to see David and David had taken her to Jim's office and she had presented that letter and he had signed it and she said, can you believe it? He signed the paper, the fool. I said, gee, that is surprising that he would sign a letter like that, saying he was terminating you because of your pregnancy. She said, yes, and that he was so embarrassed about the whole situation she didn't want to come back and see the whole situation that day.

**3.**                    Date 5/5/80

TO: All
FROM: Dave Suggs
SUBJECT:
Ladies & Gentlemen:
   We regret to announce the departure of Sue Iodice effective May 3, 1980. Sue and I decided that her condition made it impossible to continue with her heavily demanding job.
   I will assume the duties of the Financial Manager and will turn over the rest of my duties to Jim until further notice.

her condition and said that she could not stand the pressure.

On June 14, 1980 the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, contending that she was the object of sex discrimination in that her employment had been terminated because of her pregnancy, stating further that she was performing her duties at the time and was physically able to continue to do so.

In response to the plaintiff's claim of sex discrimination the defendant contended that the plaintiff was dismissed for legitimate, nondiscriminatory reasons, and at the trial offered evidence in support of this position. Specifically, the defendant argued that the plaintiff was dismissed as financial manager of Sepco due to her inability to manage the financial department, her failing performance, errors in judgment, and chronic absenteeism.

Among the witnesses called by the defendant was the plaintiff's assistant in the accounting department, Manju Banthiya. Ms. Banthiya testified that initially she was very impressed with the plaintiff and learned quite a lot from her. She further testified that she noticed a significant change in the plaintiff and her performance after the middle of 1979, in that the plaintiff became disillusioned with her work, was not paying much attention to the details, and did not appear to have much enthusiasm. Ms. Banthiya also testified that during this period the plaintiff was frequently absent from work and on many days when she came to work she was late. This witness further testified that the plaintiff had acknowledged to her that she was having problems with the job as well as health problems. Also, she stated that the plaintiff had told her that she had offered to resign, but David Suggs had convinced her to stay. At the time of the trial, Ms. Banthiya was working for another company in Houston, Texas, as an accountant, and the court has found no reason to conclude that her testimony was not credible.

The evidence also revealed a number of errors and deficiencies relating to financial matters and accounting at Sepco during 1979 and 1980. The account ledgers and checking accounts were often out of balance, there were errors in certain tax reports, errors in computer data input and erroneous reports to financial institutions. Some of these problems precipitated the termination of Sepco's relationship with the First National Bank of Atlanta. While the evidence does not support a finding that all of these problems resulted from the performance of the plaintiff as financial manager of the company, the evidence does support a finding that the inadequacy of her performance as financial manager contributed to these problems, as they were in her area of responsibility and expertise as chief financial officer of the company. Further, the evidence indicates that in April of 1980 the outside accountant for Sepco made a preliminary investigation in preparation for the year-end audit. He testified that his investigation revealed that the account records of the company were extremely sloppy, that checking account reconciliations had not been performed for several months, that several checking account statements had not been opened, and that the October, 1979 statement reflected $68,000 in unaccounted for cash.[4]

4. A. We went out and looked at the records in March of 1980 and we told our client that we would accept the engagement. Once we looked into the records we realized that the accounting records were extremely sloppy, to the point of being in a shambles.

Q. Specifically, Mr. Dean, what deficiencies or problems were made apparent to you at that time?

A. Well, one of the first things we look at when we go out into the field, we want to see what the cash looks like. We realize that if someone cannot control their cash then they have serious accounting problems. That was a first major problem that I encountered, cash—the bank reconciliations were not being performed properly and for several months we noticed there were not even any bank reconciliations.

Q. Mr. Dean, how many audits have you had occasion to conduct that were similar in the nature and scope of the examination that you were performing at that time, that is, April of 1980, with Sepco?

A. Oh, lets see, I have been in the business six and a half years. I would say approxi-

The evidence further established that April 30 was the end of Sepco's fiscal year and was a busy time of the year for the corporation. The plaintiff authorized Ms. Banthiya to take a three-day vacation (April 30, May 1–2), a decision which displeased top management of defendant corporation. When she was confronted, the plaintiff was upset to the extent that Mr. David Suggs sent her home to calm down, indicating that he would talk with her the next day (May 3, 1980). David Suggs testified that during the conversation about the vacation, the plaintiff stated that she wondered if anyone had noticed her pregnant condition and that she could not take the pressure being brought to bear upon her. David Suggs also testified that it became obvious to him during the month of April 1980 that the plaintiff simply could not fully perform her responsibilities as financial manager, and after the discussion concerning the vacation on May 2, 1980 he was fully convinced of this fact.

The evidence presented does not establish that there was any company policy or practice of terminating female employees due to pregnancy or absence for childbirth or that the company had refused to allow leaves of absence for maternity reasons. To the contrary, the evidence established that other women had become pregnant and were allowed to return to their jobs at Sepco.

## CONCLUSIONS OF LAW AND DISCUSSION

In this case the plaintiff contends that she is the victim of sex discrimination at the hands of defendant corporation in that she was terminated from her position as sales manager because she was pregnant, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* The plaintiff contends that while she has fully proved her case under the standards set forth in the case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), she has

established an even stronger case based on direct evidence of sex discrimination. In response defendant argues that plaintiff's claim of strong direct evidence has been rebutted by justifiable explanations and that any *prima facie* case established has been rebutted by the showing of legitimate, nondiscriminatory reasons for the termination of the plaintiff.

Pursuant to the 1978 amendments, the coverage of Title VII of the Civil Rights of 1964 was extended to cover pregnancy. *See* 42 U.S.C. § 2000e(k). Generally, the standards of proof in a case claiming discrimination on the basis of pregnancy are the same as in other cases of sex discrimination.

■ The order of proof set forth in *McDonnell Douglas* is applicable to discharge cases. *See Marks v. Prattco,* 607 F.2d 1153 (5th Cir.1979). Basically, this means that the plaintiff must show that she was a member of a protected class, was qualified for the job, was performing in that job, and was terminated because of her pregnancy condition. Once the plaintiff has established a *prima facie* case, the defendant employer is required to articulate a legitimate, nondiscriminatory reason for the adverse employment action it took against the plaintiff. Thereafter, the plaintiff, always bearing the ultimate burden of proof, must demonstrate that the reasons proffered by the defendant for the termination were pretextual. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980).

■ Based upon the evidence presented by the plaintiff, the court concludes that the plaintiff established a *prima facie* case of discrimination based on her pregnancy condition. This conclusion is based on the evidence that she was female, was qualified for the job, was performing the job, and was terminated because of her pregnancy condition. Regarding the establishment of a *prima facie* case, the plaintiff is only

mately 75 engagements, similar to a company the size of our client.
Q. How would you compare the condition of the financial records that you encountered in

that initial examination at Sepco Sales Corporation with the similar examinations in the other audits?
A. This was by far the absolute worst.

required to prove by a preponderance of the evidence that she was terminated from a position for which she was qualified, under circumstances which give rise to an inference of unlawful discrimination. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1094.

■ Upon careful consideration of all the evidence as set forth in the findings of fact, the court concludes that the defendant has articulated legitimate nondiscriminatory reasons for the termination of the employment of the plaintiff and thereby rebutted her *prima facie* case. That is, the reasons and explanations provided by the defendant are deemed to be legally sufficient to justify the termination of the plaintiff at the time in question. While the evidence established that there were problems in the accounting department both before the plaintiff was appointed as financial manager and after her termination, the nature of the job she held and the responsibilities attendant thereto inescapably point to the fact that she was in charge of the management and day-to-day operation of the accounting department. Further, she was hired as financial manager, an officer of the company, for the express purpose of aiding and assisting top management in the establishment of sound and workable fiscal and accounting practices. The plaintiff was the one officer with education and experience in the area of accounting. The evidence showed that the account ledgers and checking accounts were often out of balance, there were errors in tax reports and erroneous or deficient reports to lending institutions. Such problems tended to jeopardize defendant's relationship with lending institutions and others with whom it did business. Of particular note to the court is the fact that at one time a substantial number of bank statements remained unopened for a long period of time. The conclusion is inescapable that the plaintiff, as financial manager, bore the major responsibility for these errors or deficiencies. In reaching the instant conclusion, the court has relied heavily upon the testimony of the outside accountant of defendant corporation regarding the deficiencies he found in defendant's accounting practices and procedures in

April 1980, shortly before the plaintiff was terminated. Also of particular significance is the testimony of Ms. Banthiya that after the middle of 1979 the plaintiff became disillusioned with the job and did not give careful attention to details.

The timing of the dismissal and the papers signed by David Suggs are such that they are worthy of specific consideration in this opinion. The plaintiff forcefully argues that the request upon Mr. James Suggs for a 90-day maternity leave is what actually precipitated her discharge by David Suggs. The request was made on April 29, 1980, David Suggs had knowledge of the request, and the plaintiff was discharged on May 3, 1980. One fact that the plaintiff's argument overlooks is that she was not requesting a leave to begin immediately but wanted the leave to begin when the child was born, some three months in the future. Another matter of significance is that at this time top management was upset with the plaintiff for granting a three-day vacation to her assistant during a very busy period of time for the company (April 30, May 1 and 2, 1980). It was after David Suggs confronted the plaintiff with this situation that she became upset, spoke about her pregnant condition and was sent home by Mr. Suggs to calm down (on May 2, 1980). The court is not convinced as the plaintiff argued that "the reality" of the termination was the request upon James Suggs for a leave of absence.

Upon initial consideration, the letter of recommendation signed by David Suggs and his memorandum would seem to support plaintiff's position that they are the "smoking guns" which clearly establish that plaintiff was discharged because of her pregnant condition. While both documents contain language referring to the plaintiff's condition, the court has determined after careful consideration of the totality of the evidence that the explanations offered by the defendant are credible. Whereas the evidence does not conclusively establish what was discussed between the plaintiff and David Suggs by telephone on May 3, 1980, it has been demonstrated that the

letter was intended to be a letter of recommendation. It has been demonstrated that the letter was typed by the plaintiff, was principally her wording, and was not carefully read by David Suggs. The court views the interoffice memorandum as it was described by David Suggs: an effort to take the focus off the reason for the discharge of the plaintiff. The court has determined that the testimony given by David Suggs (that he thought he was doing the plaintiff a favor in the way the matter was handled) is an acceptable explanation. Finally, the court concludes that the evidence points to a situation that was inartfully handled, rather than a calculated determination by David Suggs to terminate the plaintiff because of her pregnancy condition.[5]

The court concludes that the plaintiff has failed to show that defendant's reasons for the discharge were pretextual; that her pregnancy condition was a "but for" cause or determinating factor for her discharge. *Cf. Jackson v. City of Killeen,* 654 F.2d 1181 (5th Cir.1981).

In her final memorandum brief to the court, the plaintiff cited and relied upon the case of *Lee v. Russell County Board of Education,* 684 F.2d 769 (11th Cir.1982) which held that where a case of discrimination is proved by direct evidence, the *McDonnell Douglas* tests are inapplicable. Plaintiff contends that since there is direct evidence of discriminatory motivation in this case, the defendant cannot simply rebut it by articulating a legitimate nondiscriminatory reason, but must show by a preponderance of the evidence that the same decision would have been reached regardless of the pregnancy condition; thereby raising the test set forth in *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). It appears to the court that since the *Lee* case involved 42 U.S.C. § 1983, it is distinguishable from the case at hand. If the *Lee* analysis were applicable to a Title VII case such as this, the evidence presented in this case would be sufficient to establish that the defendant would have reached the same decision to discharge the plaintiff regardless of her pregnancy.

In view of the foregoing, the clerk is DIRECTED to enter judgment in favor of the defendant with costs assessed against the plaintiff.

---

**5.** The court has not disregarded the plaintiff's testimony that on more than one occasion David Suggs suggested to her that she should consider staying at home after the baby was born, to be with the child, rather than return to work. While such suggestions might be paternalistic or chauvinistic, it has not persuaded the court to reach a different conclusion from that stated.